\_\_\_\_ FILED \_\_\_\_ ENTERED
\_\_\_\_ LOGGED \_\_\_\_ RECEIVED

MAY 04 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GRAY SAMSUNG PHONE, IMEI No. 352618093955600; A BLACK LG PHONE, IMEI NO. 3359926082600589; AND A BLACK SAMSUNG PHONE, FCC ID A3LSPHM260 | Case No. 18-1181 BPG |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, THOMAS DAVIS, being duly sworn, do hereby depose and state the following:

### INTRODUCTION

1. Your Affiant makes this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant authorizing (1) the examination of three cellular telephones further described in Attachment A (the "TARGET DEVICES")—which are in the United States Department of Homeland Security's possession in Baltimore, Maryland—and (2) the extraction of electronically stored information from the TARGET DEVICES as described in Attachment B. Police officers found and seized the TARGET DEVICES while searching Errol Anthony MITCHELL'S vehicle during a traffic stop.

2. Your Affiant believes that probable cause exists to believe that a search of TARGET DEVICES will uncover evidence, fruits, and instrumentalities of Conspiracy to Distribute and Possess With Intent to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846.

## AFFIANT'S BACKGROUND

3. Your Affiant is a Task Force Officer ("TFO") for the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"). He has been a police officer with the Maryland Transportation Authority Police since 2003 and assigned to the HSI Baltimore Seaport, High Intensity Drug Trafficking Area ("HIDTA") group as a TFO since 2016.

4. Your Affiant has personally conducted and participated in numerous federal and state narcotics investigations relating to drug trafficking, drug smuggling, and money laundering violations. During the course of those investigations, he has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; conducting court-authorized electronic surveillance, including GPS tracking; and preparing and executing search warrants that have led to seizures of narcotics, U.S. currency, and other contraband. In addition, your Affiant has authored numerous search and seizure warrants that led to the seizure of narcotics, U.S. currency, and other contraband. He has also made or participated in numerous arrests for narcotic violations. Through training, knowledge, and experience, your Affiant has become familiar with the language, terminology, traits, actions and codes used by drug traffickers in illicit drug dealing.

5. The facts set forth in this affidavit are based upon your Affiant's personal knowledge and experience obtained while participating in this investigation, including the review of documents related to this investigation, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. This affidavit does not contain all of the information known to your Affiant regarding this investigation. Your Affiant has included only the facts that are sufficient to

support a probable cause finding for the issuance of the requested warrant and does not purport to include each and every matter of fact observed or known to your Affiant or other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The TARGET DEVICES are (1) a Gray Samsung cellular telephone, Model Galaxy J3 with IMEI No. 352618093955600; (2) a Black LG cellular telephone, Model LG-B470 with IMEI No. 359926082600589; and (3) a Black Samsung cellular telephone, Model SPH-M260 with FCC ID A3LSPHM260 (collectively referred to as the "TARGET DEVICES")—all of which are in the United States Department of Homeland Security's custody in Baltimore, Maryland.

## PROBABLE CAUSE

7. On February 26, 2018 at approximately 7:14 PM, an officer with the Maryland Transportation Authority Police (MDTAP) was on duty, in full uniform and operating a marked patrol vehicle. He was assigned to a joint initiative with the Baltimore Police Department (BPD) and the Maryland State Police (MSP), as part of the Governor's Crime Suppression Program. The officer was in area of the 2300 block of Wilkens Avenue Baltimore, Maryland when he witnessed a 2005 Blue Acura with a headlight out. As the officer turned his vehicle around, he could see that the lights for the license plate on the Acura were out as well. The officer activated his emergency equipment (lights and siren) and conducted a traffic stop on the vehicle. The officer made contact with the operator who identified himself through his Maryland license as Mr. Errol Anthony MITCHELL, with a date of birth of May 15, 1960. While speaking with MITCHELL, the officer noticed that there was an unusual chemical odor to the vehicle, which smelled like a mix of cleaning and automotive chemicals. The officer observed that MITCHELL's hand was trembling when he handed him his license and instead of the registration he initially handed him a tracking

receipt for a UPS package. The officer asked MITCHELL whom the car belonged to, and MITCHELL gave him the owner's name. MITCHELL further stated that she was a friend and that he was working on the car for her and replacing the headlight. The officer asked MITCHELL if the address on his license was still his current address, and he stated that it was. The officer stated to MITCHELL that his address wasn't close to the location of the stop and asked him why he would come all the way over to the area of the stop just to replace a headlight. MITCHELL stated that he was meeting a friend who was going to help him replace the headlight and do body work on the vehicle.

8. The officer then conducted a routine check of the vehicle's registration, as well as MITCHELL's background. During the check, the officer received a return for a possible warrant through Immigration and Customs Enforcement (ICE) for deportation, which showed that MITCHELL was a previously deported felon. MITCHELL was then detained by the officer, pending confirmation that the warrant was active. Law enforcement later confirmed from ICE that MITCHELL had previously been deported for possession with intent to distribute CDS.

9. The officer asked MITCHELL if he could pat him down for weapons, so he could be placed in his car while he attempted to confirm the warrant. MITCHELL consented and during the pat down the officer felt folded wads, which he recognized through plain feel as consistent with the size and shape of U.S. currency in several different pockets on MITCHELL's person. The U.S. currency was left in Mr. Mitchell's pockets and he was placed in the Officer's patrol vehicle.

10. The officer asked MITCHELL where the person was that he was supposed to meet was; Mitchell indicated that it was a white male in the driver's seat of a Honda CRV that was parked nearby. The officer asked another officer to go over to the driver of the Honda and ask him who he was there to meet and why. The officer did so, and the male in the Honda voluntarily

identified himself as Eric Jason Eisenberg, with date of birth of September 12, 1965. Mr. Eisenberg stated he knew MITCHELL from church and made no indication that he was meeting MITCHELL to work on the Acura that MITCHELL was driving.

11. With the consent of Eisenberg, Maryland State Police investigators—who were also on the scene—conducted a K9 scan of the Honda. They also conducted a K9 scan of the Acura driven by Mitchell. The K9 alerted to the presence of CDS on both vehicles.

12. Law enforcement then informed MITCHELL that the K9 had alerted to the Acura and asked him if they were going to find any drugs in the vehicle. MITCHELL stated yes and that there was a little less than a pound of marijuana in the trunk of the vehicle. Law enforcement then searched the vehicle and found, among other things: (1) eight clear plastic resealable bags and one silver resealable bag containing marijuana; (2) a digital scale with marijuana residue on it; (3) a clear Tupperware container with fourteen clear plastic resealable bags, each of which contained marijuana; (4) two plastic bags that had previously been heat sealed and which were now cut open with the words "Blue Dream" and "Red Haze" written on them, reflecting different types of marijuana; and (5) notebooks with numbers and currency denominations written on them that appeared to be drug ledgers.

13. In the center console of the vehicle, law enforcement also recovered the TARGET DEVICES.

14. MITCHELL was placed under arrest and, in a search incident to his arrest, law enforcement recovered approximately $1,557.00 from Mitchell's person.

15. The total weight of the suspected CDS Marijuana recovered from the MITCHELL's vehicle was 725 grams—approximately 1.62 pounds. The suspected CDS Marijuana was later

sent to the Maryland State Police lab for analysis. The analysis confirmed that the substance tested positive as Marijuana.

16. Your Affiant believes that the amount of CDS Marijuana recovered from MITCHELL's vehicle, along with all of the other contributing circumstances and evidence recovered from the traffic stop, are indicative of someone that is attempting to transport, sell and deliver CDS Marijuana for distribution.

17. Moreover, through his training knowledge and experience, your Affiant knows that cellular telephones are often used by drug dealers to communicate with their sources of supply (SOS) along with other dealers and customers. Their phones often contain those telephone numbers along with text messages, photographic evidence, emails regarding shipping transactions and account information as well as other methods and records concerning trafficking. Accordingly, your Affiant now seeks authority to examine and extract electronically stored information, as described in attachment B, from the TARGET DEVICES, pursuant to this warrant.

## TECHNICAL TERMS

18. Based on his training and experience, your Affiant uses the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include Global Positioning System ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

    f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed

to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  h. Based on his training, experience, and research, your Affiant knows that the TARGET DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, with the capability to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

19. Based on my knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICES were used, the purpose of their use, who used them, and when were they used. There is probable cause to believe that such forensic electronic evidence might be on the TARGET DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when were they used.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when it was used, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which the Affiant is applying would permit the examination of the TARGET DEVICES consistent with the warrant. The examination may require authorities to employ

techniques, including, but not limited to, computer-assisted scans of the entire medium that might expose many parts of the devices to human inspection in order to determine whether they are evidence described by the warrant.

22. *Manner of execution.* Because this warrant seeks only permission to examine three devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, your Affiant submits that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23. Based upon the information contained in this affidavit, your Affiant submits that probable cause exists to believe that (1) the TARGET DEVICES, as described in Attachment A, contain additional evidence of MITCHELL's illegal conduct as well as the fruits of his illegal activities; and (2) a search of the TARGET DEVICES, in accord with Attachment B, will uncover evidence, fruits, and instrumentalities of Conspiracy to Distribute and Possess With Intent to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846.

Thomas Davis, Task Force Officer
U.S. Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn to before me this 19TH day of April, 2018.

Honorable Beth P. Gesner
Chief United States Magistrate Judge

11

**18-1181 BPG**

## ATTACHMENT A

### Items to be Searched

The following items which are currently in the United States Department of Homeland Security's custody in Baltimore, Maryland:

- a Gray Samsung cellular telephone, Model Galaxy J3 with IMEI No. 352618093955600

- a Black LG cellular telephone, Model LG-B470 with IMEI No. 359926082600589

- a Black Samsung cellular telephone, Model SPH-M260 with FCC ID A3LSPHM260

(together, the TARGET DEVICES).

**18-1181 BPG**

## ATTACHMENT B

### Items to be Seized

All records and information on the **TARGET DEVICES** described in Attachment A that relate to violations of the 21 U.S.C. §§ 841(a)(1), 846, including but not limited to:

1. any and all notes, documents, records, diaries, notebooks, and photos pertaining to the possession, manufacturing, or distribution of controlled substances, including but not limited to marijuana;

2. any and all lists or records of drug customers or suppliers and related identifying information, and types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

3. any information or records related to sources of illicit narcotics, including names, addresses, phone numbers, email addresses, or any other identifying information;

4. any information or records related to the laundering, concealing, or distribution of the proceeds of narcotics trafficking;

5. any information or records concerning travel or records of travel, including meetings with known and unknown co-conspirators;

6. any and all addresses, phone numbers, or other identifying information of co-conspirators, customers, clients, or anyone otherwise involved in drug trafficking;

7. any and all internet web browsing that indicates research of drug trafficking or otherwise indicates or suggests, participation in drug trafficking;

8. any and all Global Position System ("GPS")[1] location information, maps, saved points to include the locations of post offices, financial institutions, and addresses of co-conspirators;

9. any and all of the above files which were deleted or mislabeled to conceal;

10. evidence of who used, owned, or controlled the **TARGET DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat", instant messaging logs, photographs, and correspondence;

11. evidence of the attachment to the **TARGET DEVICES** of other storage devices or similar containers for electronic evidence;

12. evidence of the times the **TARGET DEVICES** were used;

13. any and all passwords, encryption keys, biometrics, and other access devices that may be necessary to access the **TARGET DEVICES**;

14. documentation and manuals that may be necessary to access the device or storage media in order to conduct a forensic examination of the **TARGET DEVICES**;

15. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

---

[1] GPS is a satellite-based navigation system that provides location and time information.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.